## MOORE *v.* MEADE.

1. BROKERS—REAL ESTATE BROKERS—PRINCIPAL AND AGENT—DUTY TO DISCLOSE.

   Where a real estate broker acted as the agent of both the seller and the buyer, it was his duty to disclose same to buyer, and also all the facts in his possession as to the value of the property.

2. SAME—PRINCIPAL AND AGENT—FAILURE TO DISCLOSE—FRAUD.

   Broker's representation to the purchaser of a farm, for whom he was acting as agent, that the lowest price obtainable was $7,000, when in fact the price listed to him was $5,300, he to have all he obtained over that amount, if believed and acted upon, was a fraud upon the purchaser.

3. SAME—FRAUD—DAMAGES—ACCOUNTING.

   Where the evidence shows that the broker profited by the fraud to the amount of over $900, a decree in favor of the purchaser for that amount cannot be said to be excessive, on a suit for an accounting.

Appeal from Allegan; Brown (William B.), J., presiding. Submitted January 20, 1921. (Docket No. 64.) Decided March 30, 1921.

Bill by Myron B. Moore against Harry Meade, Nellie Meade, and Millie A. Simpkins to affirm a sale of real estate, and to enjoin an action at law. Defendant Simpkins filed a cross-bill to set aside said sale as fraudulent and for an accounting. From a decree for defendant Simpkins, plaintiff appeals. Affirmed.

*Charles Thew* and *Clare E. Hoffman,* for plaintiff.

*Fidus E. Fish,* for defendant Simpkins.

STONE, J. This case is here upon the appeal of the plaintiff from a decree dismissing his bill of complaint and granting relief to the defendant Millie Simpkins on her cross-bill. In the original bill of complaint filed October 8, 1919, the plaintiff stated that defendants Harry Meade and his wife Nellie on June 9, 1919, were in possession of a farm of 80 acres in section 20, township of Trowbridge, Allegan county, which they held under a contract from one Wallace C. Blackman and wife, by the terms of which there was unpaid $4,732; and that said Harry Meade was dissatisfied with the general neighborhood and was desirous of selling his equity in said farm and moving away. That plaintiff was in the business at Allegan of buying and selling real estate, and also selling the same for others; that he had a customer, Millie Simpkins, who was "looking towards" the purchase of a farm and he called her attention to this property; that she could pay in cash only $750, but that she had a house and lot in Hopkins which she would turn in at $2,000, also a second mortgage on real estate of the value of $1,150; that the house and lot were not worth $2,000, nor was the second mortgage worth its face value. That there-

upon plaintiff interviewed the said defendants Meade, told them the circumstances, and of the prospects of selling the farm to defendant Simpkins, and that she was insisting on turning in the property aforesaid and that probably the house and lot would not be worth more than $1,000; that defendants Meade thought it might be necessary to pay up the Blackman contract in full, or at least to pay a part thereon; whereupon plaintiff entered into a written contract with Harry Meade to "swing the deal." By the terms of this contract plaintiff was to have all that he received for the farm over $5,300; that it was understood between the plaintiff and defendants Meade that they should "figure" the farm sold in that way to defendant Simpkins at $7,500 and insist upon said terms, if possible to make the sale on the same, but if impossible it was left to plaintiff to sell for a less figure.

That pursuant to said agreement said sale and deal were made with Mrs. Simpkins and the contract paid down to a sum satisfactory to the said Blackman and wife, and their contract with the defendants Meade was duly assigned by them to Mrs. Simpkins, and said second mortgage and house and lot were turned in to plaintiff, and some moneys, and a full and complete settlement was made by the plaintiff and the defendants Meade; that no misrepresentations nor fraud were perpetrated by the plaintiff with regard to the transaction with said defendants Meade and Simpkins, but, on the contrary, the transactions were entirely completed and settlement made in regard thereto; that on or about July 1, 1919, the said defendants entered into a conspiracy to defraud the plaintiff, and the bill proceeds to allege a conspiracy between said defendants Meade and defendant Simpkins to frame a case against the plaintiff, whereby all of the defendants would obtain from him large sums of money by the bringing of suits for damages, by making false claims

that the plaintiff had by misrepresentation induced said defendants Meade to sell the premises at the figure of $5,300, and that the defendant Millie Simpkins would bring her said action against the plaintiff based on falsely alleging that he had made misrepresentations to her in regard to the property, and conditions concerning said sale, and had induced her to convey her Hopkins property, and transfer her said second mortgage aforesaid; and that in pursuance of said conspiracy said defendants Meade had brought suit against the plaintiff in the circuit court for the county of Allegan claiming therein damages accruing out of the said sale to the amount of $1,200.

The bill prayed that a decree might be entered affirming the sale as against the defendant Millie Simpkins, and declaring the said defendants Meade had no cause of action or complaint against the plaintiff, and that all the defendants be perpetually enjoined from bringing suit, or suits, against the plaintiff growing out of the transaction; and that the said defendants Meade be further enjoined perpetually from prosecuting the suit then pending against the plaintiff.

The defendant Millie Simpkins filed a separate answer in which she admitted that the plaintiff was in the real estate business and that he had conversation with her relative to the purchasing of the farm, admitting that she could pay only $750 in cash, and that she wanted to turn in a second mortgage of $1,150, and a house and lot for $1,500, and that the plaintiff claimed the said house and lot were well worth $2,000 and should be turned in for that amount, and that she denied the said property was worth that amount. She denied all conspiracy, denied that there were no misrepresentations or fraudulent concealments on the part of the plaintiff, and charges the truth to be that said parties, plaintiff and defendants Meade, conspired

together to defraud her out of a large sum of money, to wit, $3,860.

As affirmative matter in the nature of a cross-bill, and for the purpose of obtaining affirmative relief against the plaintiff, she alleged that on the 9th day of June, 1919, she was the owner of a house and lot at Hopkins, Michigan, and of a second mortgage in the sum of $1,100, with accrued interest of $50, and that she was the possessor of a certain amount of cash, about $750, as stated in said bill of complaint, and that she was desirous of purchasing a farm; that the plaintiff interviewed this defendant on numerous occasions and finally he told her that he could make a trade for her for the Blackman farm, and that he subsequently took this defendant to said farm and discussed a proposed deal with her in which she was to turn over to him $750 in cash, said mortgage and interest amounting to $1,150, and the house and lot which the plaintiff told her to put in at $2,000, although she desired to put it in at $1,500; that said deal was consummated on or about June 11, 1919, she signing a deed conveying said house and lot, paying over said cash, and assigning said mortgage, with the understanding that she was to receive a deed of said farm subject to a small mortgage; that none of said parties had ever told her what the farm would cost, nor had they told her of any amount of incumbrance, but led her to believe that she would become the owner of the farm subject to a small incumbrance; and that, relying upon the judgment of the plaintiff and on the representations made to her, she consummated the deal; that the plaintiff finally turned over to her the said Blackman contract with the assignment thereof by the defendants Meade to the plaintiff, and she was also given a receipt signed by said Blackman and wife for $1,132, paid by the plaintiff to said Blackman and wife, and which was understood to be credited on the principal sum

owing according to the terms of said contract; that after she received said contract she examined it and found that the property, which had been sold for $4,732, had been conveyed to her at a valuation of $7,500; that she turned in $3,900 worth of property in the deal, putting the value of the house and lot at $2,000, and placing said house and lot at a valuation of only $1,500, she turned in only $3,400 for said contract; that there is a credit of only $1,132 on the contract and that she is the loser in the transaction to the amount of $2,268; that this defendant, soon after said deal was consummated, learned of the fraud that had been perpetrated upon her and she went to the plaintiff and demanded a settlement, and had offered to turn back said contract and said receipt and demanded that her property be returned to her, which she has since learned had been sold, so that it was impossible for her to be put *in statu quo*. She avers that the plaintiff and defendants Meade had profited by said fraud and misrepresentation in a large sum. She prays that the injunction issued in the cause be dissolved, and that if it is impossible to restore the property she conveyed by reason of any sale of any of said property, then that a decree be entered in favor of this defendant and against the defendants Meade and the plaintiff, requiring them to pay her the fair and reasonable value of the property taken from her. The cross-bill concludes with a prayer for general relief.

The cause went to a hearing and a large volume of testimony was taken in open court, and, without filing any written opinion, the trial judge by decree dismissed the bill of complaint and awarded nominal damages of 6 cents and costs to the defendants Harry Meade and Nellie Meade upon their cross-bill, and awarded damages to the defendant Millie Simpkins in the sum of $900. It was adjudged and decreed that the plaintiff pay to the defendant Simpkins forthwith

the sum of $900 as damages, together with her costs to be taxed. The damages awarded to the defendants Meade and their costs were paid, and that portion of the decree satisfied, so that we have to deal here simply with the claim of the defendant Millie Simpkins against the plaintiff. The plaintiff alone has appealed.

Many disputed questions, as between the plaintiff and defendants Meade, are not important upon this appeal, as those defendants have by their settlement under the decree dropped out of the case. No attempt has been made by counsel to comply with Rule No. 40 of this court, requiring a clear and concise statement of the facts of the case distinct from argument. This has added very materially to our labor in the case.

It appears to be the claim of the defendant Simpkins that the plaintiff was her agent in the negotiations for, and the purchase of this farm, and that it was not disclosed to her until after the entire trade was consummated that the plaintiff was acting also as the agent of the defendants Meade, and was to receive all that he obtained by such sale exceeding the sum of $5,300. This claim, it appears, is denied by plaintiff, who, in a general way, says that Mrs. Simpkins knew all about the entire arrangement. He, himself, testified that "she asked me the price and I told her somewhere about $7,500." He took Mrs. Simpkins out to the farm, which was some distance from her home, and where she appears to have been unacquainted, and it is a significant fact that a careful reading of the testimony in the case discloses that Mrs. Simpkins, personally, never made any trade or negotiations with defendants Meade about the purchase of their equity in this farm. The general trend of the testimony is that the negotiations were carried on by and between the plaintiff and the defendant Harry Meade, and save on one occasion when she attempted to get some tools and straw in the trade, she

seems to have had little or nothing to do with the negotiations. It is not disputed by the plaintiff that he was the agent of the defendants Meade in this transaction. He is a member of the bar of Allegan county, and has for a number of years been largely interested in dealing in real estate and loaning money, in connection with the-practice of his profession. On the visit to the farm the plaintiff and Mrs. Simpkins were accompanied by her daughter Madge, who is about 17 years old. She testified that her mother asked Mr. Moore "How much is this farm worth?" and he said about $7,000, and later she testified in this manner:

"Why, on the way out he said they wouldn't take less than $7,000, he didn't think, and after they got out—after they had been talking under the trees something about they wanted $7,500. * * * Moore said that to my mother, * * * said they would not take any less."

There is a great conflict in the testimony in this case and the parties are a long way apart as to what the actual facts were. We shall not here attempt to analyze the very conflicting testimony in the case. One important question is, Was the plaintiff the agent of the defendant Simpkins in the purchase of the Meade equity in the farm? He testified that he was the agent of the defendants Meade.

Was there a double agency, and if so, was there a secret profit to the plaintiff, which was not disclosed to the defendant Simpkins? This was a disputed matter upon the hearing. The house and lot were sold by the plaintiff for $1,050 within a few days. We are satisfied that the plaintiff gave Mrs. Simpkins to understand, and that she did understand, that he was representing her in the negotiation and trade and was looking after her interest. We are also satisfied from the evidence that she did not know until the trade was

closed and consummated, that the plaintiff was to have all he could get over and above $5,300 for the farm.

How much did plaintiff get out of the transaction? The following extract from the testimony of the plaintiff on redirect-examination throws some light upon this question:

"*Q.* You testify you got about this second mortgage out of the deal for yourself?

"*A.* Approximately. A little less. I got this mortgage, $1,150. I got $1,050 out of the house, and $750 cash. I paid out to Blackman $1,132 and that would leave $1,818. I paid the bank $426; taxes $40.40, Bailey $21, and $19 Mead owed me, and a note for $123.60 he owed me. I paid her $16 of rent and allowed her $8 which she collected. * * * All I have got left is this second mortgage, and these amounts will leave less than the sum of $1,150, amount of the second mortgage. I have figured nothing for my time or my expenses or anything."

In his cross-examination he answered:

"If the second mortgage is paid I have made that amount."

Whereupon the following language was used by the court:

"Judging from the last question there seems to be some misunderstanding. On the Blackman contract the plaintiff paid $1,132. He paid at the bank $426. He paid taxes, $40.40. He paid interest on a mortgage, $21, a note of $19, and a note of $120 and $3.60 interest. All that together would be $1,762, not including $16 rent which would make $1,778. On the other hand, there is a $1,150 mortgage; $1,050 house and lot, and $750 cash, which would be $2,950. $1,778 subtracted from $2,950 would leave $1,172."

It should be said in explanation of the foregoing that these transactions at the bank were amounts owing by the defendant Harry Meade, which the plaintiff had become responsible for, also for the payment of certain other items embraced in the above.

We are strongly impressed by the testimony that the plaintiff made Mrs. Simpkins believe he was acting for her, was going to help her make a good bargain, and get a good price for her house, not disclosing to her that he was in fact the agent of the Meades, too, and the terms of such agency. She had confidence that he was her friend in the transaction, she trusted him, took his word as to what the farm was worth, and was being turned in at, making no inquiry to learn its value. Not only the testimony of Mrs. Simpkins, but that of her daughter and the trend of the other testimony unmistakably point to the fact that he made her think he was her agent and working in her interest. If he was acting as her agent and was at the same time Meades' agent, it was his duty to disclose to her every fact about the farm that he knew, and nothing should have been withheld from her as to the price paid. Even if he was not her agent, he should not misrepresent to her the amount that the property, to wit, the farm, was being put in at in the deal, because this was an important factor and undoubtedly influenced the sale.

We are compelled to reach the conclusion in this case that the plaintiff represented to Mrs. Simpkins that he would help her to buy this farm, and it is equally clear to us that he did not disclose to her all he knew about the farm, its value, what it was bought for and how the title stood, what the Meades would sell it for, nor that he himself was to get all over $5,300. If he was her agent that was his duty.

In *Hogle* v. *Meyering*, 161 Mich. at p. 472, we held that the law will not permit an agent to act in a dual capacity in which his interest conflicts with his duty, without a full disclosure of the facts to his principal; and that a broker employed to effect an exchange of real property will not be permitted to retain a secret profit. "The law will not permit a man to act in a

dual capacity, and the two positions of principal and agent are inconsistent with each other." See cases cited on pp. 484, 485 of the above case; 6 C. J. p. 686; 21 R. C. L., title "Principal and Agent," §§ 11, 12, 13.

The representation, if made by the plaintiff, that Meades' price was $7,000, that that was the lowest price obtainable, when in fact the price listed to him was $5,300, was a fraud upon Mrs. Simpkins if she relied upon his representations, which she claims she did. *Hokanson* v. *Oatman*, 165 Mich. 512 (35 L. R. A. [N. S.] 423). The headnote of that case reads as follows:

"A broker, who represented to one negotiating with him to purchase a farm that the owner's price was $1,200 and that was the lowest price obtainable, when, in fact, the price at which the owner listed the land was $900, is liable for the difference, in assumpsit, to the purchaser who relied on the representations."

See, also, *Wegner* v. *Herkimer*, 167 Mich. 587; *Allen* v. *Talbot*, 170 Mich. 664; *Pratt* v. *Allegan Circuit Judge*, 177 Mich. 558; *Merlau* v. *Kalamazoo Circuit Judge*, 180 Mich. 393; *Haener* v. *McKenzie*, 188 Mich. 27, 34, and cases there cited; *Hillier* v. *Carpenter*, 206 Mich. 594; 12 R. C. L., title "Fraud and Deceit," §§ 49, 50.

Defendant Simpkins is not asking for a rescission of the trade, it appearing that the house and lot have been disposed of, but the court below granted her, upon her cross-bill, by way of compensation or damages the sum of $900. Was that amount excessive? We think not, if she was entitled to recover any sum. It appears that the house and lot were sold finally for $1,050. Putting that property at that sum, adding to it the cash, $750, the second mortgage, $1,150, the amount unpaid on land contract, $3,600, would make $6,550 as the price paid for this property. The testi-

mony as to the value of this property varies from $4,500 to $7,500. A conservative price would be $5,500. Even at those figures the amount awarded the said defendant is not excessive. That the second mortgage was worth its face value we think clearly appears by the testimony. The property had sold for $4,000; there was a $1,400 mortgage ahead of this. The testimony shows that the interest has been kept paid upon this mortgage, and it is a valuable asset. There is so much of conflict in the testimony of this case that we have been slow to reach a conclusion as to what is just and equitable between these parties. Our final opinion is, after a careful consideration of the case, that the trial judge who saw and heard the witnesses testify did, by his decree, reach a reasonable sum to be awarded to the defendant Simpkins.

We have not overlooked the claim of the plaintiff that the testimony of defendant Simpkins differed in some respects from the allegations in her cross-bill, but, under the circumstances disclosed, do not think that she is thereby prevented from recovery.

The decree below will stand affirmed, and the defendant Simpkins will recover her costs against the plaintiff.

STEERE, C. J., and MOORE, WIEST, FELLOWS, CLARK, BIRD, and SHARPE, JJ., concurred.